NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 18 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

IGOR GUNN,

        Plaintiff-Appellee,

    v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY;
PAINE WEBBER LONG TERM
DISABILITY PLAN,

        Defendants-Appellants.

No. 09-55089

D.C. No. 2:04-cv-01852-FMC-
MANx

MEMORANDUM[1]

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted April 6, 2010
Pasadena, California

Before: PREGERSON and THOMPSON, Circuit Judges, and GRAHAM,[2] Senior
District Judge.

---

[1] This disposition is not appropriate for publication and may not be cited to or
by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

[2] The Honorable James L. Graham, Senior District Judge for the Southern
District of Ohio, sitting by designation.

This is an appeal, following remand,[3] from an action to recover benefits brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Defendants-Appellants Paine Webber Long Term Disability Plan ("the Plan") and Reliance Standard Life Insurance Company ("Reliance"), the issuer of the insurance policy underlying the Plan and the Plan's claim administrator (collectively "appellants"), appeal from the decision of the district court finding that Reliance's denial of benefits was an abuse of discretion and awarding long-term disability benefits to plaintiff-appellee Igor Gunn ("Gunn"), a participant in the Plan.

Reliance initially awarded Gunn long-term disability benefits due to multiple sclerosis and severe depression, since the Plan permitted the payment of benefits for long-term disability based on physical and/or mental illness during the first twenty-four months of disability. Reliance later determined that Gunn was not eligible for benefits beyond the initial 24-month period. Citing a policy limitation which precluded an award of benefits beyond the initial 24-month period for total

---

[3] The district court's first decision awarding benefits to Gunn applied the de novo review standard of review. *See Gunn v. Reliance Standard Life Ins. Co.*, 399 F.Supp.2d 1095 (C.D. Cal. 2005). The case was remanded with instructions to apply the deferential standard of review, including the conflict of interest inquiry, adopted in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006)(en banc). *See Gunn v. Reliance Standard Life Ins. Co.*, 235 Fed.Appx. 553 (9th Cir. Aug. 15, 2007)(unreported).

disability "caused by or contributed to by" mental or nervous disorders,[4] Reliance found that Gunn failed to show that he was totally disabled as a result of physical illness.[5]

In reviewing the plan administrator's decision, the district court applied language included in a booklet prepared by Gunn's employer, UBS/Paine Webber ("Paine Webber"), which differed from the policy language in that it precluded benefits for disability "due to" mental illness. The district court interpreted this language as allowing benefits so long as Gunn's disability was not due solely to mental illness. Citing *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002), the district court applied the booklet definition as being the definition most favorable to Gunn. *Id*. at 1260-61. The

---

[4] The policy defines "Total Disability" after benefits have been paid for 24 months as being where "an Insured cannot perform the material duties of any occupation. Any occupation is one that the insured's education, training or experience will reasonably allow." The policy also contains the limitation that "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable" beyond the 24-month period unless the claimant is in a hospital or institution at the end of the 24-month period. The policy further states: "Mental or Nervous Disorders" are defined to include "(5) depressive disorders; (6) anxiety disorders; ... or (9) mental illness."

[5] The Plan participant bears the burden of providing satisfactory proof of disability. The policy requires a Plan participant to send written proof of disability within ninety days after the total disability occurs. The policy further states that "[w]hen we receive written proof of Total Disability covered by this Policy, we will pay any benefits due" and that monthly benefits will stop as of the date the participant "fails to furnish the required proof of Total Disability."

3

district court reviewed the administrator's decision, conducted a conflict of interest analysis, and concluded that Reliance's decision to terminate benefits was an abuse of discretion. *See Gunn v. Reliance Standard Life Ins. Co.*, 592 F.Supp.2d 1251, 1261-62(C.D. Cal. 2008)("*Gunn II*").

## I. STANDARD OF REVIEW

We review de novo the district court's choice and application of the standard of review to decisions by ERISA fiduciaries, as well as its interpretation of ERISA insurance policy language. *Abatie*, 458 F.3d at 962; *Metropolitan Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006). "We review for clear error the underlying findings of fact." *Abatie*, 458 F.3d at 962. Because the Plan unambiguously provides discretion to the administrator, the standard of review shifts "from the default of de novo to the more lenient abuse of discretion." *Id.* at 963.[6]

Our abuse of discretion review is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Abatie*, 458 F.3d at 967. Thus, where, as here, a structural conflict exists because the insurance company administrator both funds and administers the Plan,

---

[6] The Plan states that Reliance "shall serve as the claims review fiduciary with respect to the insurance policy and the Plan ... [and] has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits."

"the court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009). Our decisions in *Abatie* and *Montour* provide the specific factors that a court should weigh in determining whether an administrator abused its discretion. *See Abatie*, 458 F.3d at 968-69, 974; *Montour*, 588 F.3d at 630.

## II. DISCUSSION

### A. Application of Summary Plan Document

### 1. Summary as a Plan Document

Appellants first argue that the district court erred in holding that the booklet distributed by Paine Webber was a SPD. The "Disability Plan" booklet does not contain all of the twelve requirements for a SPD, as listed in *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d 1326, 1329 (9th Cir. 1996) (citing 29 U.S.C. § 1022(b)). However, the "Disability Plan" booklet refers employees to a booklet entitled "Legal and Administrative Overview" booklet, also distributed to plan participants, for further information about filing or appealing a claim and their rights as plan participants. This court has held that an ERISA plan may be made up of several booklets and documents. *See Horn v. Berdon, Inc. Defined Benefit Pension Plan*,

5

938 F.2d 125, 127 (9th Cir. 1991); *see also* 29 C.F.R. § 2520.102–3(s) (a plan's claims procedures may be furnished as a separate document). The "Disability Plan" booklet and the "Legal and Administrative Overview" booklet, when read together, substantially comply with the requirements for a summary plan description under 29 U.S.C. § 1022(b).

**2. Disclaimer Clause**

Appellants argue that the district court erred in applying the language of the "Disability Plan" booklet in light of the disclaimer in that booklet. The "Disability Plan" booklet states that the SPD "does not determine rights under the LTD Plan but is intended only to summarize the important provisions of the LTD Plan" and that in the event of any inconsistency between the SPD and the policy, "the terms of the Plan Document will govern." This court held in *Pisciotta* that a similar disclaimer which "clearly stated that the contract was the controlling document" and "was available for review by any employee who wished to see it" was enforceable. 91 F.3d at 1331. Enforcement of the disclaimer is not precluded by *Bergt*, 293 F.3d at 1144-45 (applying language from the plan master document which was more favorable to the employee than the SPD language); since *Bergt* makes no reference to any disclaimer clause being present in that case, nor does it discuss the holding in *Pisciotta* regarding the effect of a disclaimer clause, it is not

6

controlling here. The "Legal and Administrative Overview" booklet informed

Paine Webber employees that the insurance policy was the controlling document,

and also informed them that the insurance policy was available for review by any

employee who wished to see it and told them how to find it. Under *Pisciotta*, the

disclaimer in this case is enforceable, and the district court should have applied the

language found in the policy.

## 3.     Integration Clause

Appellants further argue that the language in the Paine Webber "Disability

Plan" booklet cannot be applied due to the integration clause in the policy. The

policy provides the entire contract between Paine Webber and Reliance "is this

Policy, your Application ... and any attached amendments." The policy further

provides that any change or waiver "must be in writing, signed by either our

President, a Vice President, or a Secretary" and "must also be attached to this

Policy." An integration clause which contained language similar to that found in

the Reliance policy was enforced by this court in *Grosz-Salomon v. Paul Revere

Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001). *See also Shaw v. Connecticut

General Life Ins. Co.*, 353 F.3d 1276, 1282-84 (11th Cir. 2003)(citing *Grosz-

Salomon* and enforcing the integration clause).[7] Applying *Grosz-Salomon*, we hold

---

[7] Gunn argues that the reasoning in *Grosz-Salomon* applies only to plan amendments, not to "contemporaneous plan documents." However, Gunn points to

7

that the integration clause precludes the application of the language in the "Disability Plan" booklet to the extent that it differs from the language in the policy.

### 4. "Disability Plan" Booklet Outside Administrative Record

Appellants also argue that the district court should not have considered the "Disability Plan" booklet because it was not a part of the administrative record. Judicial review of an ERISA plan administrator's decision on the merits is generally limited to the administrative record. *Montour*, 588 F.3d at 632; *Banuelos v. Construction Laborers' Trust Funds for Southern California*, 382 F.3d 897, 904 (9th Cir. 2004).[8] In the absence of the disclaimer and the integration clause, the

---

no evidence that the "Disability Plan" booklet was drafted at the same time as the policy, or that Reliance had any involvement in the preparation of the booklet.

[8] The district court may hear extrinsic evidence for the limited purpose of determining to what degree, if any, a plan administrator's decision was affected by a conflict of interest, *see Abatie*, 458 F.3d at 970, or when the standard of review of the administrative decision is de novo, *Banuelos*, 382 F.3d at 904. However, neither of these exceptions apply here. Although *Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 585 n. 1 (8th Cir. 2006), cited by Gunn, would permit a court to consider evidence outside the administrative record for the purpose of determining whether a de novo or discretionary standard of review should apply, a court may not consider plan documents outside the administrative record in addressing the merits of the administrator's decision to grant or deny benefits. *See Banuelos*, 382 F.3d at 903-04. It is not "unfair," as Gunn suggests, for Reliance to contest the application of the SPD language; unlike *Barham*, where Reliance verified that the version of the policy in the record was accurate, Reliance never admitted in this case that the SPD was a valid Plan document.

8

appropriate course of action would have been for the district court to remand the matter to Reliance to permit it to interpret the language in the "Disability Plan" booklet. However, since we have held that the disclaimer and the integration clause are enforceable, we will refer to the definitions in the policy in reviewing Reliance's decision to deny benefits.

**B. Review of Decision Denying Benefits**

**1. Analysis of the Plan and Medical Evidence**

Appellants argue that the administrative record supports Reliance's determination that Gunn was not disabled. Appellants do not dispute that Gunn is unable to work due to a mental or nervous disorder, namely, severe depression, nor does Reliance dispute that Gunn suffers from multiple sclerosis and has some physical symptoms as a result of the disease. Appellants' position is that the language of the mental illness exclusion required Gunn to show that he was totally disabled solely due to his physical condition stemming from his multiple sclerosis, without taking into account the disabling effects of any mental or nervous disorders. This interpretation of the limitation for mental and nervous disorders does not conflict with other Plan terms and is reasonable.

The records of Gunn's treating physicians support Reliance's finding that Gunn's multiple sclerosis alone was not disabling. In his treatment notes of April

9, 2001, Dr. Robert Andiman, M.D., a neurologist, stated that Gunn had "M.S. - no exacerbation." Dr. Andiman's notes of April 15, 2002, indicated that Gunn reported problems with balance, but his notes for May 13, 2002, reported that Gunn had completed seven physical therapy sessions and that his strength was improving. In his report of October 27, 2003, Dr. David W. Brandes, M.D., a neurologist, diagnosed Gunn as having a remitting/relapsing form of MS. In his treatment notes dated December 23, 2003, Dr. Brandes referred to Gunn's multiple sclerosis as "mild."

Reliance also relied on the independent medical examination of Gunn by Dr. Carl Orfuss, M.D., a board-certified neurologist and psychiatrist, which included a physical examination of Gunn and a review of Gunn's medical records. Dr. Orfuss noted that Gunn had physical impairment in the form of mild gait instability, which was not in itself a disabling symptom, and he expressed the opinion that Gunn would not be prevented by his multiple sclerosis from working at a sedentary job. Reliance also obtained a records review by Dr. William Hauptman, M.D., who is board certified in internal medicine, gastroenterology and quality assurance and utilization review. Dr. Hauptman opined that the medical records did not support impairment from sedentary work predicated upon Gunn's multiple sclerosis.

Some medical records stated that Gunn was disabled "both" as a result of

10

multiple sclerosis and depression. However, the use of the word "both" in these records could be interpreted as meaning that either severe depression or multiple sclerosis, viewed independently, rendered Gunn disabled, but also simply that multiple sclerosis and severe depression were two conditions which contributed to Gunn's overall disability. The opinion that multiple sclerosis and severe depression, considered together, resulted in total disability is not sufficient to avoid the policy limitation precluding benefits where mental or nervous disorders caused "or contributed to" the applicant's disability. Although Gunn's treating physicians documented Gunn's symptoms of multiple sclerosis, they never addressed the specific question of whether Gunn would meet the definition of total disability based solely on his multiple sclerosis without considering his severe depression.

Gunn argues that even if his disability must be due solely to multiple sclerosis, his mental symptoms of depression and cognitive dysfunction were attributable to multiple sclerosis, a physical disease; therefore, these mental symptoms could be considered in establishing disability without violating the limitation for mental and nervous disorders. Under this interpretation, the mental illness limitation would only apply if the mental or nervous disorder causing or contributing to the participant's disability was a condition totally independent from any depression, fatigue, and cognitive deficits that would normally occur when a

11

person suffers from multiple sclerosis or some other physical illness. The Plan definition says nothing about the mental or nervous disorder having to originate from a cause completely independent from the claimant's physical illness.

However, even assuming that Gunn's interpretation of the mental illness limitation is correct, the medical records fail to establish that Gunn's depression and cognitive dysfunction were solely attributable to his multiple sclerosis or attributable to a degree sufficient to result in disability based on the symptoms of multiple sclerosis. Although Dr. Michael P. Gross, Gunn's treating psychiatrist, raised the issue of whether Gunn's depression arose from his multiple sclerosis in his April 1, 2002, report , he reached no conclusion in that regard, stating, "It is not clear, and probably irrelevant, whether there is a direct neurological connection between the psychiatric symptoms and the multiple sclerosis for this patient." On the questionnaire completed that same date, he stated that Gunn "has multiple sclerosis <u>and</u> mood and thinking difficulty" and that "multiple sclerosis *contributes* to mental picture," thus suggesting that there were other causes for Gunn's mental problems. The records of Dr. Brandes likewise do not establish that Gunn's depression was solely attributable to his multiple sclerosis. In his report of October 27, 2003, Dr. Brandes stated that "the main cause of the disability is the MS related fatigue and cognitive dysfunction." However, Dr. Brandes provided a

12

multiple axis diagnosis of: (1) relapsing-remitting multiple sclerosis; (2) severe depression; (3) fatigue secondary to #1; and (4) cognitive dysfunction secondary to #1 and/or #2. This diagnosis indicates that he viewed Gunn's "severe depression" as a separate illness which was at least a contributing cause of Gunn's cognitive dysfunction and disability. The fact that in his treatment notes of December 23, 2003, Dr. Brandes described Gunn's multiple sclerosis as "mild" but noted that he had "severe depression" also indicates that he did not regard Gunn's severe depression as being solely a symptom of his multiple sclerosis.

In contrast, Dr. Orfuss diagnosed Gunn as being "severely disabled because of ongoing psychiatric illness manifested by severe depression, excessive fatigue, lack of energy, sleeplessness, etc." Dr. Orfuss stated that he "would attribute [Gunn's] disability ... to the psychiatric problem and not to the multiple sclerosis." Dr. Hauptman agreed with the opinion of Dr. Orfuss that Gunn's cognitive deficits were based on psychiatric disease and not on multiple sclerosis.

There is additional evidence in the record which supports a finding that Gunn suffered from severe depressive and anxiety disorders of psychiatric origin which were independent of his multiple sclerosis, including: the finding of the Social Security Administration law judge that the severity of Gunn's depression met the requirements for an affective disorder; the February 28, 2001, emergency

13

room records diagnosing severe anxiety disorder with catatonia; the March 8, 2001, diagnosis of depressive disorder given by psychiatrist Dr. Drest Gorchynski; Dr. Gross's April 1, 2002, report stating that Gunn was "clinically depressed" and giving a diagnosis of bipolar disorder (there is no evidence in the record that multiple sclerosis can cause bipolar disorder); the April 29, 2002, diagnosis of severe depression offered by Dr. Leslie P. Weiner, a neurologist; and the December 23, 2003, treatment notes of Dr. Brandes, stating that Gunn suffered from severe depression. The record includes several reports indicating that Gunn had a documented history of depressive episodes long before he was diagnosed with multiple sclerosis, including one severe episode with suicidal thoughts while in his teens, which also supports a finding of a separate origin for his psychiatric problems.

Reliance's decision to deny benefits was grounded on a reasonable factual basis for concluding that Gunn's multiple sclerosis alone was not disabling, and that, but for his psychiatric mental and nervous disorders, he would be able to work. Reliance adequately explained the reasons for its decision in its letters of September 10, 2003, and March 11, 2004, and demonstrated that it considered the evidence presented by Gunn. Reliance had discretion to weigh the conflicting evidence, and did not abuse that discretion in denying benefits. *See Black &*

14

*Decker Disabil. Plan v. Nord*, 538 U.S. 822, at 831-34 (2003).

**2. Conflict of Interest Analysis**

Appellants argue that the district court erred in its conflict of interest analysis. The first ground for the existence of a conflict of interest cited by the district court concerned Reliance's letter of April 16, 2003, to Gunn, which referred specifically to the new definition of "disability" applicable after 24 months, but did not specifically note the Plan's limitation for mental illness. The district court concluded that this deprived Gunn's physicians of the opportunity to focus on the issue of whether Gunn's disability stemmed from his multiple sclerosis, his depression, or both. *Gunn II*, 592 F.Supp.2d at 1261.

Gunn argues that Reliance deliberately omitted any reference to the mental illness limitation in the hopes that Gunn would supply only the name of his psychologist so that the mental illness limitation could be applied. However, the letter was not suggestive and imposed no limitations on the type of medical information which could be submitted; it requested "any medical information or vocational information that you would like us to consider in making our decision," not just information bearing on Gunn's mental condition. There is no language in the letter or questionnaire which would suggest to Gunn that Reliance was not interested in receiving information concerning his multiple sclerosis symptoms.

15

Gunn argues that Reliance did not comply with the requirements of 29

C.F.R. § 2560.503-1(g), citing *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d

1461 (9th Cir. 1997).[9]  The notification requirements of § 2560.503-1(g)(iii) refer

only to the contents of a notification of adverse benefit determination.  Likewise,

this court in *Booton* did not specifically interpret that regulation as requiring that a

request for additional information be made before the initial denial of benefits, but

rather stated that "*[i]f benefits are denied in whole or in part*, the reason for the

denial must be stated in reasonably clear language[.]"  *Booton*, 110 F.3d at 1463

(emphasis supplied).

However, even assuming *arguendo* that Reliance should have mentioned the

mental illness limitation in the April 16th letter, Reliance's failure to do so does

not give rise to an inference that Reliance acted in bad faith.  Neither the regulation

nor this court's decision in *Booten* would have placed Reliance on clear notice of

any obligation to cite all potentially relevant plan provisions in a letter requesting

medical information for a benefits eligibility review.  In addition,  Gunn was given

a full and fair review of his claim.  He was given notice of the mental illness

---

[9] Section 2560.503-1(g) requires a plan administrator to "provide a claimant with written or electronic notification of any adverse benefit determination."  § 2560.503-1(g).  The notification must include "(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]" § 2560.503-1(g)(iii).

limitation in the initial denial letter of September 10, 2003, which quoted the Plan provision concerning the limitation for mental or nervous disorders, and, while represented by counsel, he had the opportunity to present additional records specifically addressing that issue in pursuing his appeal. Reliance's failure to cite the mental illness limitation does not demonstrate the Reliance acted under a conflict of interest.

The district court also concluded that Reliance's use of Dr. Hauptman[10] to conduct a records review was further evidence of bias. The district court relied on *Conrad v. Reliance Standard Life Insurance Co.*, 292 F.Supp.2d 233 (D. Mass. 2003), in which the court found that Reliance's denial of benefits was arbitrary and capricious because Dr. Hauptman's report indicated a bias on his part in favor of rejecting the plaintiff's claim. *See Gunn II*, 592 F.Supp.2d at 1262-63. Dr. Hauptman has been retained by Reliance on numerous occasions to conduct records reviews. Although it is appropriate to consider Dr. Hauptman's long-standing relationship with Reliance in weighing the degree of any conflict of interest attached to his opinion, that relationship alone does not mandate a finding that Reliance should have completely disregarded his opinion.

---

[10] Gunn argues that Dr. Hauptman, a gastroenterologist, was not qualified to express an opinion in this case. However, Dr. Hauptman is also board-certified in internal medicine. In that capacity, he was qualified to analyze treatment records concerning Gunn's multiple sclerosis.

17

In commenting on Dr. Hauptman's review of the records in the instant case, the district court noted that in the assessment section of his report, Dr. Hauptman did not refer to Dr. Brandes's October 27, 2003, Comprehensive Neurological Evaluation, which noted that Gunn was "totally disabled as a result of multiple sclerosis,"[11] but instead focused on Dr. Brandes's treatment notes of December 23, 2003, where Dr. Brandes stated that Gunn's multiple sclerosis was "mild." *Gunn II*, 592 F.Supp.2d at 1262 n. 12. However, Dr. Hauptman devoted two paragraphs in his report to a discussion of Dr. Brandes's October 27th evaluation, and specifically noted Dr. Brandes's statement that Gunn was totally disabled as a result of the multiple sclerosis and due to his cognitive dysfunction and fatigue; thus, he clearly considered the entirety of Dr. Brandes's report and diagnosis. The fact that Dr. Hauptman relied on Dr. Brandes's December 23, 2003, assessment that Gunn's multiple sclerosis was "mild" in concluding that Gunn's disability was due to his psychiatric illness was not unreasonable in light of the fact that Dr. Brandes himself diagnosed Gunn as having a relapsing-remitting form of multiple

---

[11]Dr. Brandes actually stated in his October 27, 2003, report that "the patient is totally disabled as a result of his multiple sclerosis, due to his cognitive dysfunction, and fatigue, both of these will preclude inability [sic] to work under any situation." He further indicated that Gunn's cognitive dysfunction was secondary to relapsing-remitting multiple sclerosis and/or severe depression, thus suggesting that Gunn's depressive illness was possibly a contributing cause of his cognitive dysfunction and inability to work.

18

sclerosis as well as severe depression.

The district court also criticized Dr. Hauptman for voicing his agreement with Dr. Orfuss's conclusions even though he was not specifically asked to comment on the opinion of Dr. Orfuss. *Id.* However, Reliance did not specifically ask Dr. Hauptman to comment on any of the medical opinions contained in Gunn's records; the memo simply stated, "Please review & advise if MS alone is impairing." Dr. Hauptman did not limit his comments to the report of Dr. Orfuss, but also commented on the conclusions of Gunn's treating physicians in the assessment portion of his report. Since the report of Dr. Orfuss was among the records Dr. Hauptman was given to review, the comment was appropriate.[12]

Finally, the district court cited as further evidence of bias the fact that "Reliance accepted whole-heartedly the opinions of its own physicians, that plaintiff's disability was caused 99% by his depression and only 1% by his multiple sclerosis, in spite of all medical evidence to the contrary offered by plaintiff." *Gunn II*, 592 F.Supp.2d at 1263. First, there is no evidence that Dr. Orfuss, who performed the independent medical examination, was a Reliance physician or that he ever performed any other evaluation for Reliance. Second,

---

[12]We note that even if the opinion of Dr. Hauptman is disregarded entirely, the record is still sufficient to support Reliance's conclusion that Gunn was disabled because of mental illness, not because of his multiple sclerosis.

19

Reliance did not ignore the evidence that Gunn suffered from multiple sclerosis. Rather, the issue was whether Gunn met the criteria for disability if only his multiple sclerosis symptoms were considered. The district court's comment implies that Gunn's medical evidence on that point was unequivocal, when in fact it was not; Gunn's physicians never clearly addressed that question in their treatment notes or reports.

The fact that Reliance ultimately accepted the opinions of Drs. Orfuss and Hauptman, who concluded that Gunn's disability was attributable to his mental illness, severe depression, rather than to multiple sclerosis, does not establish that Reliance simply ignored the evidence relating to his multiple sclerosis or reached a biased result. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 878 (9th Cir. 2004), *overruled on other grounds, Abatie v. Atta Health & Life Ins. Co.,* 458 F.3d 955, 969 (9th Cir. 2006). The reports of Drs. Orfuss and Hauptman as well as Reliance's decision letters indicate that they did consider the medical records of Gunn's treating physicians. The fact that Reliance ultimately accepted the opinions of Drs. Orfuss and Hauptman in regard to whether Gunn's multiple sclerosis symptoms were sufficient in themselves to result in total disability is not sufficient to show bias. *See Black & Decker Disability Plan*, 538 U.S. at 825.

After considering all of the circumstances relied on by the district court as evidence of a conflict of interest or bias on the part of Reliance, we conclude that the district court placed undue weight on these factors. The circumstances cited in support of an alleged conflict of interest on the part of Reliance are insufficient to undermine the reasonableness of Reliance's decision based on medical evidence in the record or to render that decision an abuse of discretion.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Reliance's decision to deny long-term disability benefits was supported by evidence in the administrative record and was not an abuse of discretion, taking into account any conflict of interest on Reliance's part. The circumstances cited in support of Reliance's alleged abuse of discretion and alleged conflict of interest may constitute grounds for reasonable disagreement over the weight and interpretation of conflicting medical evidence, but the resolution of such matters is well within the discretion granted to Reliance as the claims administrator. We therefore reverse and vacate the judgment entered by the district court, and remand with instructions to enter judgment in favor of defendants-appellants on the administrative record.

**REVERSED, VACATED AND REMANDED**

*Igor Gunn v Reliance Standard Life Insurance 09-55089*

Pregerson, J. dissenting:

Igor Gunn was a member of his employer's long-term disability plan ("Plan"). Reliance Standard Life Insurance insures the Plan and is the Plan's claims administrator—a structural conflict of interest.

Gunn suffers from multiple sclerosis and depression. Gunn applied for long-term disability benefits. Reliance initially approved Gunn's claim and paid Gunn long-term disability benefits for twenty-four months.

Under the Plan, a member loses his eligibility for long-term disability benefits after twenty-four months if the member's disability is "caused by or contributed to by mental or nervous disorders." As the twenty-four month mark drew near, Reliance decided that despite Gunn's multiple sclerosis, Gunn would have been able to work if he had not also suffered from depression. Based on that decision, Reliance terminated Gunn's long-term disability benefits. The majority concludes that Reliance's decision to terminate Gunn's benefits was reasonable and that Reliance did not abuse its discretion. I disagree.

As noted above, the Plan has a structural conflict of interest because Reliance both administered and insured the claims filed under the Plan. For that reason we "consider numerous case-specific factors, including the [] conflict of

1

interest, [to] reach a decision as to whether [Reliance abused its discretion] by weighing and balancing those factors together." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630; *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc). As outlined below, on balance, a review of the relevant factors in this case demonstrates that Reliance *did* abuse its discretion.

First, although some medical evidence supported Reliance's decision to terminate Gunn's benefits, Reliance disregarded or discounted contrary medical evidence. Specifically, Reliance disregarded or discounted medical evidence supporting the conclusion that Gunn's multiple sclerosis alone rendered him unable to work. Examples of such evidence include a 2001 report from Dr. Jessica Cho, one of Gunn's treating physicians. In that report Dr. Cho concluded that Gunn's multiple sclerosis rendered Gunn unable to work. Dr. David Brandes's 2003 report is another example of such evidence. In that report, Dr. Brandes, a neurologist at the Northridge Multiple Sclerosis Center, concluded that Gunn was "totally disabled as a result of his multiple sclerosis."

Second, Reliance initially misrepresented to Gunn the nature of its investigation. Specifically, Reliance sent Gunn a letter stating that it was investigating whether Gunn was disabled to such an extent that he could not hold

2

"any occupation." The letter made no mention of the Plan's mental/nervous disorder limitation. Reliance, however, was not investigating whether Gunn was able to perform "any occupation," but rather was investigating whether Gunn's disability was caused by his depression such that he was ineligible for continued benefits under the Plan's twenty-four month mental/nervous disorder limitation.

Third, Reliance hired, and relied on the evaluation of, Dr. William Hauptman, a medical expert who was previously found to have engaged in biased claims evaluations. *See, e.g.*, *Conrad v. Reliance Standard Life Ins. Co.*, 292 F.Supp.2d 233, 238 (D. Mass. 2003) ("[T]he reports Dr. Hauptman generated betray a palpable bias in favor of rejecting the claim."). Finally, Reliance asked the medical experts that it hired whether Gunn's inability to work was dependant on his depression, but Reliance did not ask Gunn's medical providers to answer that question.

In sum, Reliance terminated Gunn's benefits based on its decision that, despite Gunn's multiple sclerosis, Gunn would have been able to work if he had not also suffered from depression. Yes, some evidence supports that decision. But, in my opinion, the evidence that supports Reliance's decision is clearly outweighed by the evidence that undermines it. There was medical evidence that Gunn's multiple sclerosis alone *did* render him unable to work. Reliance,

3

however, did not reconcile that evidence with its contrary conclusion. Moreover, Reliance initially misrepresented to Gunn the nature of its investigation—leading him to believe that it was investigating the extent of his disability when, in fact, it was investigating the cause of his disability. Furthermore, Reliance hired Dr. Hauptman, a medical expert with a history of biased evaluations. And finally, Reliance did not ask Gunn's medical providers whether Gunn's multiple sclerosis alone rendered him unable to work. For these reasons, I conclude that Reliance abused its discretion and acted in its own self-interest when it terminated Gunn's long-term disability benefits. Accordingly, I dissent.